IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

UNITED STATE OF AMERICA

v.                                                        **Docket No. 2:09CR00259**

JOHN THEODORE TIANO, M.D.

### DEFENDANT'S SENTENCING MEMORANDUM

The Defendant, John Theodore Tiano, M.D., by counsel, submits the following
memorandum in support of his request for a non-imprisonment sentence.

*Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 574 (2007) and *Gall v. United
States*, 552 U.S. 38, 128 S. Ct. 586, 596 (2007) have given district courts the discretion to do
what they believe is right and impose sentences outside the Guideline Range when appropriate.
Both cases make it clear that the Guidelines are now truly only advisory. Now, a district court
has some assurance that it can articulate reasons based on findings of mitigating or aggravating
circumstances and expect their sentences not to be overturned unless it abuses its discretion. In
*Gall*, the Supreme Court held "that the sentence imposed by the experienced District Judge in
this case was reasonable." *Id.* at 41. The Court for several articulated reasons granted probation
in a case where the Guideline Range called for a sentence of 30 to 37 months.

While we know from *Gall* that "the Guidelines should be the starting point and bench
mark" *Id.* at 49, counsel respectfully submits that when the Court considers the mitigating

circumstances involved, John Tiano is a classic example of a defendant who does not require imprisonment to meet the purposes of an appropriate sentence.[1]

## I.    Standard of Review

John Tiano should be sentenced in accordance with 18 U.S.C. § 3553 (a)(2) which requires imposition of "a sentence *sufficient, but not greater than necessary*," to accomplish the following purposes:

(A)    to reflect the seriousness of the offense;

(B)    to promote respect for the law;

(C)    to provide a just punishment for the underlying offense;

(D)    to afford adequate deterrence to criminal conduct;

(E)    to protect the public from further crimes of the defendant; and

(F)    to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To meet such purposes, this Court is to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable range established by the U.S. Sentencing Guidelines, any applicable policy statement of Congress or the U.S. Sentencing Commission, the need to avoid

---

[1] The Department of Justice also supports non-incarcerated sentences. *See*, Remarks as Prepared for Delivery by Attorney General Eric Holder at the 2009 ABA Convention, August 3, 2009, at 2, available online at *http://ww.usdoj.gov/ag/speeches/2009/ag-speech-090803.html* ("We will not focus exclusively on incarceration as the most effective means of protecting public safety. For although spending on prison construction continues to increase, public safety is not continuing to improve.").

unwarranted sentencing disparities, and the need to provide any restitution. See 18 U.S.C. §§ 3553(a)(1) & (3)-(7).

Courts look to 3553(a) as the guidepost for sentencing post *Booker, United States v. Ferguson*, 456 F. 3d 660 (6th Cir. 2006). After considering the enumerated factors, the ultimate mandate of the statute is to impose the minimum punishment needed to satisfy the purposes of sentencing. *See*, e.g. *United States v. Cull*, 446 F. Supp. 2d 961, 963 (E.D. Wis. 2006).

In deciding upon an appropriate sentence, the *Gall* Court made it clear that district judges are not permitted to "presume that the Guideline range is reasonable." *Id.* At 11-12. This Court is likewise not allowed to give undue weight to the advisory range calculated under the U.S. Sentencing Guidelines, or to take the calculated guidelines as being indicative of a "presumptively reasonable" sentence. *Id.* at 12. In fact, the *Gall* Court rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." The Court clearly established that district judges have an informational advantage over appellate courts and thus the discretion to consider the totality of the circumstances respective of each individual defendant. *Id.* at 12-14.

After determining the defendant's Guideline Range, this Court may decide that the guideline sentence:

> should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. See Rule 32(f). Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing, contemplated by federal sentencing procedure.

*Rita v. United States*, 551 U.S. 338, 351 (U.S. 2007)

This Court's mandate post-*Rita* is to give equal weight to all the sentencing factors set forth by 18 U.S.C. 3553(a), and based upon such considerations only impose a sentence which is sufficient, but not greater than necessary to accomplish the purposes set out in 18 U.S.C. 3553(a)(2). *See Rita, supra*, at 381; see also *United States v. Davenport*, 445 F. 3d 366, 370 (4th Cir. 2006)(favorably citing *United States v. Foreman*, 436 F. 3d 638, 644 at n. 1 (6th Cir. 2006)); *United States v. Green*, 436 F. 3d 499, 457 (4th Cir. 2006).

To the extent the Court deviates from the standard guidelines from the stated guidelines range, it simply must make findings and articulate reasons tied to the § 3553(a) factors. Imprisonment is not an appropriate means of promoting correction and rehabilitation. *See*, 18 U.S.C. § 3582(a). Of course, the Court will enjoy even greater discretion now that counsel has learned today that a substantial assistance motion will be filed.

## II. History of Offense

### A. Admission of Criminal Liability

By way of introduction, Defendant is being sentenced for his involvement with a medical clinic located in Kermit, West Virginia, called the Justice Medical Clinic. Defendant, while a resident at Marshall University, worked at the clinic reviewing charts and seeing patients. Once the demands of his residency program became too burdensome, he entered into collaborative agreements with nurse practitioners to enable them to treat the patients, and he would travel to the clinic in the evenings to review charts.

4

This decision established a flawed system which ultimately resulted in the two charges to which he pleaded guilty and for which he takes full responsibility. When he signed the first collaborative agreement in December, 2005, he admits he carelessly signed it without reading the reference to nurse practitioners having "limited prescriptive authority" or without looking up and reading the appropriate code section which would have explained they had only 72 hour authority. Never having read the limitation and never having been told by any nurse practitioners of the same, he allowed his DEA registration to be used improperly and thus, clearly and definitely aided and abetted a violation of Title 21 U.S.C. §842(a)(2) as charged in Count One of the Information. Dr. Tiano readily admits he should have known of the limitation and never allowed his DEA number to be used as it was.

This system indirectly led to the Justice Clinic fraudulently charging Medicare for services as if a doctor had seen patients instead of nurse practitioners. The difference in payment was only 15%, and once Dr. Tiano learned of the incorrect billing, he told Mr. Justice several times to bill appropriately. He also told the billing company about the problem. When he signed on as a registrant with Medicare, he agreed: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." He cautioned Mr. Justice several times to get it right and called the billing company on multiple occasions. See attached as Exhibit 1 is an email corroborating his efforts. Nonetheless, he readily admits again that his failure to make sure it was done correctly reflects the kind of reckless disregard and deliberate indifference referred to above. Defendant has taken responsibility for his wrongdoing and expressed remorse from his first meeting with authorities.

5

### *B. Factual Details Including Some Mitigating Factors*

Being simply a resident and having no experience running a clinic, and knowing many patients were seeking pain medications, Dr. Tiano sought to introduce a program at the clinic, mirrored after Marshall University's program in regards to the issuance of prescriptions for controlled substances. He had the patients sign contracts, instituted random drug tests, checked prior medical records to verify injuries, would refer some patients to pain clinics, and refused to prescribe schedule II controlled substances. He further implemented a "one pharmacy rule" whereby all controlled substances were sent to one pharmacy to ensure another layer of protection from "drug seekers." Dr. Tiano had learned of the "one pharmacy rule" through his education at Marshall University and the text of "Responsible Opioid Prescribing: A Physician's Guide" written by Scott M. Fishman, MD. A portion of the pertinent text is attached as Exhibit 2.

In addition to pain medication, the clinic prescribed a wide range of other medications. While this does not tell the whole story as many patients apparently paid in cash, attached as Exhibit 3 is a chart documenting the number of controlled substances prescriptions submitted as opposed to other medications. This chart does support that patients were being treated for other health problems besides chronic pain. While he did fire some patients and refer others to pain clinics, the sheer number of patients receiving pain medications indicate his safeguards were woefully inadequate. Dr. Tiano especially regrets that the nurse practitioner system he agreed to participate in and helped create caused so much pain medication to be dispensed.

When Defendant began his work at the clinic, he quickly learned that his involvement in setting up the clinic would require more than simply "moonlighting," as he had previously

6

thought. In fact, the owner of the clinic, Cameron Justice, was a young man with no experience in the medical field. Accordingly, Dr. Tiano contacted an acquaintance to handle the billing requirements. This was not an "inside job." Dr. Tiano knew the owner of the billing company, which was doing the billing work for a cousin of Dr. Tiano. He had never socialized with the owner and was not close to him. Dr. Tiano, while certainly not an expert in billing Medicare or Medicaid, recognized that there are legal pit falls in this area and entrusted the task to an experienced billing firm. Dr. Tiano had no direct part in the billing. When the nurse practitioners would see a patient, she would fill out a billing sheet which was retrieved by a clinic employee. When Dr. Tiano reviewed the charts at night the billing sheets were no longer a part of the patient's chart. He did not sign off on the billing unless he personally saw a patient (which he did regularly in the fall of 2005), and did not know at first that it was not being done correctly.

At some point, Dr. Tiano learned that there were questions being raised as to whether the billing was being done properly; he was told by Mr. Justice that they were being done correctly. When he learned of the 15% excessive billing rate and that the Clinic was billing as if he rather than a nurse practitioner was seeing the patients, he told Mr. Justice to get it right and also informed the billing company that they needed to bill correctly. He did not, however, sufficiently follow up to ensure that false bills were not being submitted. He has, since day one, taken responsibility for his reckless disregard and deliberate indifference; it is clear that his financial woes influenced his inaction.

After his dissociation with the Justice Medical Clinic, Dr. Tiano learned that his name was still being used on prescriptions and billing statements. Accordingly, he sent certified letters in August 2007 to the clinic, the billing company and the pharmacy advising them to stop

7

utilizing his name in conjunction with the operations. Copies of these letters and their return receipts are attached as Exhibit 4. Incredibly, even this failed to stop the Clinic and billing company from billing Medicare under Dr. Tiano's name which continued for several months later.

### C. Post Plea Update

Since Dr. Tiano's guilty plea, he has been working to stay a productive member of society and to use his medical knowledge as a means to help the Haitian people devastated by the earthquake earlier this year. He has already spent time in the region seeing hundreds of patients each day. His written account of his experience is quite compelling. See Exhibit 5. Should the Court allow it, he has expressed a desire to further aid this region by spending a year of his sentence in Haiti volunteering. A copy of a letter sent by Trish Putnam with the organization Friends of Ft. Liberte is attached as Exhibit 6. The need in Haiti is profound, and Dr. Tiano's assistance in that region invaluable. The brief time Dr. Tiano has spent in Haiti has undoubtedly had a profound influence on him.

### D. Miscellaneous Clarifications or objections to Presentence Report which does not impact the guideline calculation

While Dr. Tiano does not wish to nit-pick, counsel has explained that the Court will inquire if he has any objections to any parts of the presentence report. So, the following are a list of some clarifications he would like to point out. They do not affect the guideline calculations and counsel raises them here to save time at the hearing.

8

Page 8 ¶21    Regarding the "did nothing" phrase, Dr. Tiano implemented some procedures designed to weed out blatant drug seekers, and in fact, fired some patients, but admittedly the nurse practitioner system was flawed from the start and his efforts were clearly inadequate.

Page 9 ¶29    As previously explained, Defendant did not "sign off" on the billing sheets except when he saw patients. He never saw the actual bills sent by the clinic to the billing company or what the billing company sent to Medicare.

Page 10 ¶34   Defendant objects in that he never gave permission for anyone to bill under his name unless he personally saw the patient. He agrees he failed to make sure the practice was stopped once he learned about it.

Page 11 ¶34   Probation's presentence report notes that Defendant "reports" sending certified letters. Not only did Dr. Tiano indeed send the letters, but certified mail receipts are attached in Exhibit 4.

Page 11 ¶35   Dr. Tiano's compensation was not based on the number of claims submitted to Medicare. In the beginning the Clinic could not afford to pay Dr. Tiano his salary. It paid him some money and took care of some of his personal bills, but fell behind in what it owed to Dr. Tiano. To catch up with what Dr. Tiano was owed, the Clinic agreed to pay Dr. Tiano one-third of anything received for a four month period. After the four months, Dr. Tiano was a salaried employee, without regard to the number of claims submitted or the amount received by the Clinic..

Page 13 ¶47   Regarding the "suspect" phrase, while Defendant should have clearly known that his DEA number was being misused by the nurse practitioners because of their

limited prescriptive authority; he did not suspect or realize they had such a limitation. While nurse practitioners in some states do have thirty-day authority, and while legislation has been proposed in West Virginia to give them such authority, Dr. Tiano inexcusably did not know the law in West Virginia at the time. Regarding the reference to his directing Mr. Justice to a billing company, Defendant agrees with the probation officer's assessment that this supports the notion of him being an "organizer;" however, Dr. Tiano wants the Court to understand his intentions in doing so were for a good, not evil purpose.

## III.    Types of Sentences Available

Defendant is to be sentenced in accordance with 18 U.S.C. § 3553 to either a term of probation, a fine, or a term of imprisonment. 18 U.S.C. § 3551(b). The applicable statutory maximum sentence for violating 21 U.S.C. § 846 is 4 years imprisonment; 1 year supervised release; $250,000 fine; $100 special assessment; denial of certain federal benefits; and restitution as applicable. This makes defendant's offense a Class D felony. The applicable statutory maximum sentence for violating 18 U.S.C. §§ 1347 and 2 is 10 years imprisonment; 3 year supervised release; $250,000 fine; $100 special assessment; and restitution, as ordered by the Court.

## IV.    Applicable Guideline Range

Dr. Tiano withdraws any objection to the pre-sentence writer's conclusion as to the calculation for violation of 21 U.S.C. § 846, conspiracy to misuse his registration number. Dr. Tiano, however, disagrees with a 2 point enhancement for abuse of a position of public and

private trust in conjunction with violation of 18 U.S.C. §§1347 and 2. Pursuant to *U.S. v. Technic Services, Inc.*, 314 F. 3d 1031, n. 13 (9th Cir. 2002), this adjustment related to a special skill cannot be utilized in conjunction with the adjustment for a leadership role. Per §3B1.3 "if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1 (Aggravating Role). The commentary explains the phrase special skill. "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, ***doctors***, accountants, chemists, and demolition experts."

The two provisions can be used in conjunction with one another only if the defendant "abused a position of public or private trust." However, the definition of "public or private trust" does not seem to apply to this count. Dr. Tiano had no active role in the Clinic's billing. Moreover, the two phrases cannot be used interchangeably to allow for use of both adjustments. "The district court may not avoid that result by recharacterizing a 'special skill' as a 'public trust.'" *U.S. v. Technic Services, Inc.*, 314 F. 3d 1031, n. 13 (9th Cir. 2002). Rather, to utilize this enhancement would simply be re-labeling "use of a special skill" to "abuse of public and private trust" a result cautioned against in *Technic Services, supra.*

Utilization of these two enhancements in conjunction with one another in the Medicare setting was discussed in *U.S. v. Mills*, 138 F. 3d 928 (11th Cir. 1998). The *Mills* court, as noted in the Federal Sentencing Guidelines Handbook (2009-2010 Edition), found that the relationship between health care providers and the Medicare agency too attenuated to constitute a position of trust. See also, *U.S. v. Garrison*, 133 F. 3d 831 (11th Cir. 1998)("a sentencing court must be careful not to be 'overly broad' in imposing the enhancement for abuse of a position of trust or

11

'the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise' would receive a section 3B1.3 enhancement. *United States v. Moored*, 997 F. 2d 139 (6th Cir. 1993)); *United States v. Koehn*, 74 F. 3d 199 (10th Cir. 1996)(In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud.); *United States v. Boyle*, 10 F. 3d 485 (7th Cir. 1993)(Whether someone occupies a 'position of trust' for purposes of §3B1.3 does not turn on simple categories that might be used to characterize the relationship . . . Therefore, the sentencing court must look beyond descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given.).

In *Garrison*, the defendant's enhancement for abuse of position of trust was overturned on appeal. She had been convicted of Medicare fraud. On appeal, she argued that since she had brought in a third party to act as billing intermediary between herself and Medicare, that the relationship was too attenuated to constitute a violation of a public or a private trust. The court agreed finding "[w]hile Medicare may have been the victim in this case, the section 3B1.3 enhancement is unavailable because [defendant] did not occupy a sufficiently proximate position of trust relative to Medicare." *United State v. Garrison*, 133 F. 3d at 841.

Counsel was able to find few cases upholding and discussing these two enhancements with similar facts. However, authority which has addressed this issue require a proactive role in the medical billing to establish the existence of a "trust." *United States v. Vivit*, 214 F. 3d 908 (2000). In *Vivit*, the defendant was given an enhancement for being in a leadership position as well as abusing a position of trust *vis-a-vis* the insurance companies he was billing for medical procedures which had never been done. The court in *Vivit* noted that the enhancement could not

12

be due to a special skill because it would constitute double-counting. *Id.* at 914. Rather, the enhancement was based on an abuse of public or private trust. Importantly, in *Vivit*, the defendant doctor had himself been fraudulently preparing bills and billing insurance companies. *Id.* at 913. See also, *United States v. Sidhu*, 130 F. 3d 644 (1997)(abuse of position of trust enhancement in conjunction with leadership role enhancement proper where defendant assisted efforts to collect on fraudulent billings and meeting with insurers. Office staff testified that defendant was involved in collecting fraudulent billings on a daily basis.).

Here, there is no abuse of a public or private trust involved in that Dr. Tiano played no direct role in the Clinic's billing. Indeed, he brought in a billing company to be responsible to properly bill. He did not write or even see the improper bills go out or the payments that came in. He had no contact with Medicare. He tried to stop the improper billing, but admittedly he did not do enough. Evidence that he had no active involvement with the billing is established by the fact that after he gave written notice to the Clinic and billing company, they still improperly billed under his name.

The net effect, if Defendant's objection is granted, would be that the total offense level noted in paragraph 69 would be 16. The guideline imprisonment range noted in paragraph 88 would be 21 to 27 months.

## A.    Downward Departure for Substantial Assistance

Counsel has been informed minutes before filing this memorandum, that the government is filing a substantial assistance motion. Dr. Tiano has been instrumental in the government's continuing prosecution and investigation and prosecution of others which has saved the government considerable money and time. Defendant continues to cooperate and promises to do

so after his sentence.  Dr. Tiano is expected to testify soon before a grand jury and later at trials, if necessary.  Counsel could have asked for a delay in sentencing, but Dr. Tiano wants to get on with his punishment as the sooner it is over, the sooner he can hopefully get back to practicing medicine in this country.

### B.  Downward Departure for Extraordinary Acceptance of Responsibility

If the government does not file a substantial assistance motion, counsel respectfully submits that the Court could justify a further departure under §5K2.0 for extraordinary acceptance of responsibility.  Practically every indicted defendant who pleads guilty in federal court receives a downward adjustment under § 3E1.1 for acceptance of responsibility.  Dr. Tiano however, not only saved the government the time, expense and burden of preparing for a trial, but also the time, expense and burden of convening a grand jury to obtain an indictment.  In fact, Dr. Tiano had counsel call the U.S. Attorney's office to expedite working out a plea agreement.

Defendant admitted his culpability when he first spoke to authorities and immediately offered to assist them.  When months were passing, and the government was presumably investigating other indictments, Dr. Tiano sought to reach a plea agreement and enter his pleas as soon as practical.  Counsel believes this type of cooperative conduct should be recognized and certainly encouraged.

### C. Downward Departurs Based on Defendant's History and Characteristics under 18 U.S.C. 3553(a)(1)

The Supreme Court in *Gall* has opened the door for courts to consider and give weight to many factors; including but not limited to the following:

14

1.    When and how a defendant turns from his criminal conduct;

2.    How consistent and for how long a defendant has lived in a law abiding manner;

3.    A lack of significant criminal history;

4.    The fact that the defendant was not an organizer, leader or manager;

5.    The amount of support from family, friends and work associates;

6.    The age and immaturity of a defendant at the time of the offense;

7.    The existence of substance abuse at the time of criminal conduct and the consistent lack of use sine that time;

8.    The fact that probation involves "a substantial restriction of freedom;"

9.    Whether a defendant is or is not a danger to society;

10.   Whether a defendant is likely to return to criminal behavior;

11.   Whether there are special facts justifying a disparate sentence respecting co-conspirators; and

12.   Whether compelling family circumstances exist where a defendant's family will be hurt if no one is available to take care of them.

Defendant will address each.


### 1.    *When and how defendant turned from his criminal conduct*

Defendant readily admits his culpability in allowing nurse practitioners to write thirty day prescriptions and for the deliberate indifference regarding the improper billing during his time at the Justice Medical Clinic. Although he took inadequate steps, he told the clinic manager and the billing company to bill at the 85% rate that was proper for nurse

15

practitioners and not at the 100% rate when a doctor sees a patient.  Moreover, he contacted the
billing company, pharmacy and clinic in writing when he learned that his name was being
improperly used for billing purposes.  See exhibit 4.   Even those letters did not stop the
fraudulent billing in his name.  When he first spoke to the authorities he admitted his culpability
and agreed to cooperate with them.  Since his guilty plea, he has taken further steps to use his
medical knowledge to assist humanity in an enormous fashion.  Specifically, he spent time in
Haiti following his guilty plea volunteering and rendering much needed medical aid.

> 2. *How consistent and for how long defendant has lived in a law abiding*
> *manner*

Defendant has never before run afoul of the law.  Defendant has always worked hard and
has earned the respect of his peers as a man of good character.  He has been gainfully employed
since disassociating with the Justice Medical Clinic.  When Defendant is not working to support
his family, he is spending time with his young daughter, with whom he shares custody.

> 3. *A lack of significant criminal history*

Not only does Defendant lack significant criminal history, he lacks any sort of
criminal history what so ever.  He has never been in trouble with the law before.  Rather than a
criminal history, defendant's is one of taking on an extraordinary amount of responsibility, a
personality trait that is likely largely responsible for the trouble he finds himself in today.  After
failed family business ventures, defendant took it upon himself to work to pay back a large
mortgage on the family's property and to work to pay for his brother to go to medical school.
These dire financial straights were what caused defendant to moonlight at the Justice Medical
Center in the first place, not any sort of criminal motive.

16

4.   *Defendant's role as an organizer, leader or manager*

While Defendant qualifies as an organizer, leader or manager under the guidelines, he did not originally plan or intend to be in such a position. When he agreed to work at the Justice Medical Center, he thought he was simply going to be moonlighting at a clinic. Instead, he found that the clinic was being run by Cameron Justice, a young man with no experience in the medical field. So, with him and Cameron Justice having no experience running a clinic, he was thrust into making decisions early on in the process. Dr. Tiano advised the Justice Clinic to bring in a medical billing company to avoid incorrect billing, rather than have Cameron Justice hire an individual to do it. Defendant's objection is not to the enhancement, which he agreed to, but to any possible implication that he had intentionally got someone he knew to do the billing for a criminal purpose. Just the opposite is true. Dr. Tiano knew that the legal pitfalls associated with medical billing made it necessary to use a firm who could perform this service correctly. When Cameron Justice could not find a doctor to take over, Dr. Tiano's decision to agree to a nurse practitioner monitoring system was flawed from the start.

5.   *The amount of support from family, friends and work associates*

The responsibility and dedication demonstrated by Dr. Tiano to his family, friends and co-workers has been reciprocated by them in this matter. Defendant has forwarded by separate cover various letters written by family, friends and work associates on his behalf. Included therein is correspondence from new work associates. Dr. Tiano has met various individuals in his work with the people of Haiti. One has written on his behalf, recognizing the important needs he could address with the Haitian people. Additionally, as mentioned before, Dr. Tiano has a young daughter with whom he has joint custody over. Despite many other

17

obligations, he is putting in extraordinary amounts of work in an attempt to not only save his

family's home, but also to see that his daughter is taken care of.

> 6.   *The age and immaturity of defendant at the time of the offense*

Although Dr. Tiano waited several years to begin his medical education, at

the time of the offense, he was still an inexperienced and somewhat naïve doctor. He had never

practiced in a setting which essentially required him to help get a clinic up and running. He had

no expertise with billing. In short, and not to be disparaging to Dr. Tiano, he was an immature

doctor at the time of this offense, in over his head.

> 7.   *The existence of substance abuse at the time of criminal conduct and the consistent lack of use since that time*

There has been no evidence that Defendant has ever abused any substances.

Since this investigation began, he has continued to lead a productive life, supporting his family

and even volunteering. At no times has he abused any substances.

> 8.   *Probation involves a "substantial restriction of freedom"*

Prolonged probation and supervised release are particularly harmful to Dr.

Tiano. As mentioned, he has hefty financial obligations for which he has assumed responsibility.

Defendant will not be able to practice medicine in West Virginia until after his sentence is

completed, including any period of supervised release. Moreover, he will be unable to

participate in federal benefit programs for a minimum period of five years following his

conviction, which makes finding work as a doctor extremely difficult. He has learned that the

U.S. Armed Forces has a substantial shortage of doctors and once his sentence is ultimately

exhausted, he is seriously considering enlisting. At least one recruiter has indicated that his

18

application may be favorably considered as middle-aged and older doctors have enlisted successfully. A prolonged period of probation and supervised release will only serve to delay his ability to use his medical expertise in a positive fashion following his sentence.

### 9. *Whether defendant is a danger to society*

In short, defendant is not a danger to society. There is no evidence that Dr. Tiano has ever been violent or that he currently poses a danger to anyone.

### 10. *Whether defendant is likely to return to criminal behavior*

Defendant is certainly not likely to return to criminal behavior. Prior to this investigation, he had a very lucrative job offer in southern West Virginia. Since he pled guilty, this offer has been rescinded. Due to his heavy financial obligations, Defendant has no intention of returning to criminal behavior, as he can be a much better asset to his family by being gainfully employed. Defendant never planned to engage in criminal behavior in the first place. He will certainly do everything he can, after his sentence is completed, to ensure that his medical practice is within the confines of the law.

### 11. *Whether other facts justifying a disparate sentence*

Dr. Tiano, while recognizing his past mistakes, submits that he is more of an asset to society as a whole if he retains the ability to practice medicine. In addition to his past volunteer work in Haiti, he is hoping to spend a year in Haiti as part of his sentence to further help the victims of the recent earthquake. If agreeable to the Court, Dr. Tiano would volunteer a year in Haiti while on supervised release, returning once every three months to visit his family and daughter, or when needed by the government to testify in Court and would abide by all other conditions set.

19

> 12. *Compelling family circumstances exist where defendant's family will be hurt if no one is available to take care of them*

Defendant and his family are struggling financially. The longer defendant is prevented from practicing medicine, the longer his family will be suffering financially. He has demonstrated remorse for his actions since day one, and has accepted responsibility. Defendant's family, including his young daughter, will likely suffer if he is subjected to lengthy imprisonment and lengthy supervised release.

## V. Defendant's Requested Sentence

Given all these factors, most significantly that he has earned a substantial assistance motion, defendant respectfully submits that a non-imprisonment sentence is warranted. The Justice Department itself appears more open to alternative sentences in non-violent, first-time offenses. Counsel suggests as a fair and just sentence that Dr. Tiano be placed on home confinement for six months and on supervised release for a period of twelve months. While the details are still being compiled, defendant would request he be permitted to spend the year of this supervised release in Haiti. As many have said, the surroundings and accommodations in Haiti are worse than those in a federal prison. As Trish Putnam from Friends of Ft. Liberte states in her letter, the need in Haiti is great. As she notes, Dr. Tiano would be helping people who would "literally die if an American Health Care Provider isn't in town." Regular reporting to the probation department by Dr. Tiano's supervisor in Haiti could definitely be established.

Dr. Tiano is presently under probation with the Board of Medicine and when he returns to practice medicine, he will be monitored carefully by the Board of Medicine. Since he is not a

danger to the public and has no drug or alcohol issues, the federal probation's role in supervision will be obviously limited. The important monitoring will be related to his profession to which he hopes to return following the completion of his sentence. Dr. Tiano will have to abide by all pre-conditions the Board of Medicine will set as well as ongoing requirements for a long period of time. Often times a Court likes to find a meaningful form of public service which not only sufficiently punishes or humbles a Defendant, but uses the Defendant's talents to turn his negative and criminal actions into positive and beneficial ones to others. The need for ongoing medical help in Haiti is outrageous and in this one instant the Court could fashion a sentence whereby this Defendant would have to live a very austere existence under adverse conditions and yet actually help to save and prolong lives.

> Respectfully Submitted,
> John Theodore Tiano,
> Defendant,

/s/ Heather M. Langeland

_____

J. Timothy DiPiero (WV Bar #1021)
Heather M. Langeland (WV Bar #9938)
DiTRAPANO, BARRETT & DiPIERO, PLLC
604 Virginia Street, East
Charleston, WV 25301
Telephone: (304) 342-0133
Fax: (304) 342-4605

21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                    **CRIMINAL ACTION NO. 2:09-00259**

**JOHN THEODORE TIANO, M.D.**

**CERTIFICATE OF SERVICE**

I, Heather M. Langeland, counsel for the defendant herein, do hereby certify that a true and correct copy of the foregoing **DEFENDANT'S SENTENCING MEMORANDUM** was served upon the following counsel of record utilizing the Court's electronic case management system this 20th day of May, 2010:

Monica K. Schwartz
United States Attorney
Southern District of West Virginia
300 Virginia Street, East
Suite 4000
Charleston, WV 25301

/s/ Heather M. Langeland
_____
Heather M. Langeland

22